APPEL, Justice.
Randall Pals’ vehicle was searched during a traffic stop and the police officer discovered marijuana. Pals moved to suppress the evidence, challenging the legality of the traffic stop and search under the search and seizure clauses of the Iowa and Federal Constitutions. The district court denied the motion to suppress, and Pals was convicted at a bench trial of possession of a controlled substance in violation of Iowa Code section 124.401(5) (2007). Pals appealed, arguing the district court erred in denying his motion to suppress. The court of appeals affirmed. We granted further review. For the reasons expressed below, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for further proceedings.
I. Background Facts and Prior Proceedings.
On August 18, 2007, Worth County Deputy Sheriff Mark Wubben received a complaint that two dogs, a Brittany spaniel (Brittany) and a Labrador retriever (Lab), were running loose in Joice, Iowa. Wubben observed the dogs running loose and noticed they did not have tags or collars. While he was looking for the dogs, Wub-ben saw a white truck with a red topper driving around that appeared to be searching for the dogs. Wubben spoke to a friend of Randall Pals who advised him that the dogs belonged to Pals. Wubben was unable to locate the dogs or Pals at that point, so he left town and headed toward Rice Lake.
On the highway, Wubben encountered Pals’ truck coming from the opposite direction. He ran the plates and confirmed the truck belonged to Pals. Wubben began to follow Pals and noticed the Brittany in the back of the truck, but he did not see the Lab. Wubben pulled Pals over to advise Pals that the dogs needed tags and collars and that a Joice municipal ordinance prohibited dogs running at large.
Wubben remarked, “I see you found one of them before I did” to Pals, and Pals acknowledged the two dogs belonged to him. Pals said he recovered both dogs and explained that the Lab was in a kennel in the back of the truck. Wubben testified the kennel was not visible from outside of the truck and he never saw the Lab before stopping Pals’ vehicle.
Wubben requested Pals’ driver’s license and went back to his patrol car where he contacted his lieutenant. Wubben was advised to provide a verbal warning about the dogs. Wubben returned to Pals’ vehicle and asked for proof of insurance, which Pals was unable to produce. Wubben then asked Pals to come back to his patrol car.
Pals sat in the front passenger seat of Wubben’s patrol car. Wubben told Pals that Pals needed to update his address on his driver’s license. Wubben explained the need for tags and collars on the dogs and gave Pals a verbal warning. He also discussed the necessity of having proof of insurance in the vehicle and explained that Pals would alleviate the need for a no-insurance ticket if Pals would call the sheriffs office with his insurance policy number and expiration date. Pals agreed to do so.
Wubben then asked Pals, “Say you don’t have anything, any weapons or drugs or anything like that in your vehicle, do you? Do you care if I take a look?” Wubben testified that Pals said, “[S]ure, go ahead.” Wubben and Pals exited the patrol car and approached Pals’ vehicle. Wubben began the search and, within two minutes, discovered a half gram of marijuana in the truck. *771 At the conclusion of the search, Pals was handcuffed, advised of his Miranda rights, and placed under arrest.
Pals was charged with possession of a controlled substance, marijuana, a serious misdemeanor, in violation of Iowa Code section 124.401(5). Pals filed a motion to suppress the evidence, claiming: (1) he was still seized at the time of the search and the consent was not voluntarily given, and (2) Wubben lacked probable cause and exigent circumstances to search the vehicle. The district court denied the motion to suppress and subsequently found Pals guilty of possession of a controlled substance. Pals appealed, and the court of appeals affirmed the conviction. Pals sought further review, which we granted.
II. Scope of Review.
Pals argues the district court should have granted his motion to suppress on federal and state constitutional grounds. Therefore, this court’s review is de novo. State v. Lane, 726 N.W.2d 371, 377 (Iowa 2007). This review requires “an independent evaluation of the totality of the circumstances as shown by the entire record.” State v. Turner, 630 N.W.2d 601, 606 (Iowa 2001) (internal quotation marks omitted). The court gives “deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but [is] not bound by such findings.” Lane, 726 N.W.2d at 377.
III. Issues Presented.
Pals presents three search and seizure claims in this appeal.[1] Pals first challenges the constitutionality of a traffic stop that is supported only by reasonable suspicion of a completed civil infraction. Second, Pals suggests that there were no ar-ticulable facts to give rise to reasonable suspicion of some separate illegal activity that would justify the request to search Pals’ vehicle. Third, Pals asserts that, even if the traffic stop was valid, his consent to the search of his car cannot be considered free and voluntary because it was coerced under the facts and circumstances presented in this case.
Pals brings these claims under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. While these provisions use nearly identical language and were generally designed with the same scope, import, and purpose, we jealously protect this court’s authority to follow an independent approach under our state constitution. State v. Ochoa, 792 N.W.2d 260, 267 (Iowa 2010). In Ochoa, we explained:
[W]hile United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions.... The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.
Id. Our approach to independently construing provisions of the Iowa Constitution that are nearly identical to the federal counterpart is well supported in our case law and the law of other jurisdictions. See, e.g., Ochoa, 792 N.W.2d at 267; State v. Cline, 617 N.W.2d 277, 285 (Iowa 2000), overruled on other grounds by Turner, 630 N.W.2d at 606. Even where a party has *772 not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law. State v. Bruegger, 773 N.W.2d 862, 888 (Iowa 2009). When, as here, a defendant raises both federal and state constitutional claims, the court has discretion to consider either claim first or consider the claims simultaneously. Ochoa, 792 N.W.2d at 267.
IV. Merits.
A. Introduction. The question of permissible scope of searches and seizures by law enforcement in the context of minor infractions is a major issue in criminal law today. The proper scope of police authority in the context of routine traffic stops has been the subject of countless commentaries,[2] many cases,[3] and a number of consent decrees.[4] In particular, use of minor traffic infractions as a springboard to consent searches has generated charges of abuse and racial profiling.[5] Alleged abuses by law enforcement authorities in the context of traffic stops have led to calls for major reform of police practices and even the abandonment of consent searches as a result of vehicle stops altogether.
A number of jurisdictions have entered into consent decrees that provide a framework to control the exercise of police authority during traffic stops. The consent decrees are variable. Some have prohibited law enforcement from seeking consent to search as a result of minor traffic infractions.[6] Others have allowed consent *773 searches if there is particularized suspicion.[7] In some jurisdictions, reporting requirements have been imposed to inhibit the development of arbitrary police practices.[8] In Iowa, one municipality has entered into a confidential settlement with the Iowa Civil Rights Commission related to alleged racial profiling in traffic stops.[9] In addition to consent decrees, a number of jurisdictions have initiated limitations on consent searches pursuant to traffic stops as a matter of policy.
This case involves a stop to investigate an ongoing minor infraction of a municipal ordinance. Although it does not involve a stop for a minor traffic violation, many of the concerns that arise in the setting of a routine traffic stop apply here with equal force. We consider the issues with due regard to the legitimate needs of law enforcement, but with a recognition that our constitutional limitations on searches and seizures by law enforcement protect fundamental values of liberty and human dignity and are a bulwark against arbitrary governmental intrusions into the lives of citizens.
B. Legality of the Initial Stop. We first consider the legality of the initial stop in this case. Pals was stopped in his vehicle by Wubben based on the officer’s belief that Pals was violating a Joice municipal ordinance. Pals argues Wubben was without authority to detain him initially because he was suspected only of violating a minor civil infraction — allowing his dogs to run loose — and because the civil infraction was already completed. The State contends Wubben had an objectively reasonable basis to believe the infraction was ongoing because he only saw one of Pals’ two dogs in the truck.
“The Fourth Amendment’s protection against unreasonable intrusions on a person’s liberty arises when an officer seizes a person.” State v. Reinders, 690 N.W.2d 78, 82 (Iowa 2004) (internal quotation marks omitted). “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ within the meaning of this provision” and therefore must be reasonable under the circumstances. Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). “As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Id. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95. Pals was not accused of violating a civil traffic law, however. *774 Instead, Pals was suspected of violating a Joice municipal ordinance.
Under certain circumstances, police may detain persons in the absence of probable cause if the police have reasonable suspicion to believe criminal activity is taking place. In Terry v. Ohio, 392 U.S. 1, 20-27, 88 S.Ct. 1868, 1879-83, 20 L.Ed.2d 889, 905-09 (1968), the Supreme Court applied a balancing test, weighing the individual’s right to autonomy and freedom against the government’s interest in effective crime prevention and detection and in the officers’ need to protect themselves. The Court held police may seize a person on less than probable cause when they suspect the person is about to commit a crime. Terry, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907.
Under Terry, police may stop a moving automobile in the absence of probable cause to investigate a reasonable suspicion that its occupants are involved in criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 616-17 (1975). The Court has also held that police may stop an automobile based on reasonable suspicion to investigate a serious past crime. United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 612 (1985).
Pals argues that, because a violation of the dogs-on-the-loose ordinance was not a serious crime or felony, he could not be stopped by Wubben for its violation. He points to the language of Hensley, which states:
We need not and do not decide today whether Terry stops to investigate all past crimes, however serious, are permitted. It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion.
Id. Pals’ contention is that Wubben’s stop was improper because reasonable suspicion of a completed civil infraction is insufficient to justify a seizure under the Federal and Iowa Constitutions.
Federal courts are divided on the issue of whether the Fourth Amendment per se prohibits police from stopping a vehicle based only on reasonable suspicion of a completed misdemeanor or civil infraction. Compare Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 771 n. 6 (6th Cir.2004) (holding police may not make a stop with only reasonable suspicion of a “mere completed misdemeanor”), with United States v. Hughes, 517 F.3d 1013, 1017-18 (8th Cir.2008) (applying a balancing test), and United States v. Grigg, 498 F.3d 1070, 1081 (9th Cir.2007) (same). However, even those courts that apply a balancing test often find reasonable suspicion of a completed misdemeanor to be insufficient to justify a stop under the Fourth Amendment. See, e.g., Hughes, 517 F.3d at 1018 (concluding reasonable suspicion of completed trespass — a misdemeanor under state law — insufficient to justify Terry stop); Grigg, 498 F.3d at 1081-82 (holding unreasonable a traffic stop based on a complaint that the driver had been playing his stereo at an excessive volume earlier in the day).
We need not address this issue, however, because Pals was not pulled over based on reasonable suspicion of a completed civil infraction. Instead, Pals was detained based on probable cause of an ongoing civil infraction. It is well settled that a police officer may pull over a car based on probable cause of an ongoing civil infraction. See Whren, 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95. *775 Probable cause exists where “ ‘the facts and circumstances within [the officer’s] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that’ an offense has been or is being committed.” Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879, 1890 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)); see also State v. Freeman, 705 N.W.2d 293, 298 (Iowa 2005) (“Probable cause is present ‘if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it.’ ” (quoting State v. Bumpus, 459 N.W.2d 619, 624 (Iowa 1990))).
Wubben had probable cause to believe Pals was committing an ongoing violation of the municipal ordinance. Wubben observed the dogs running around town, observed Pals’ truck appearing to search for the dogs, spoke to a friend of Pals who confirmed the dogs belonged to Pals, and later observed only one of the dogs in the back of Pals’ truck.
Pals argues the record shows the infraction was completed because Wubben is heard on the recording of the stop stating, “I saw him uptown scooping them up.” Wubben testified at the hearing he saw only the Brittany in the back of the truck and not the Lab. When Wubben first approached Pals’ truck, he stated, “I see you found one of them before I did.” Pals replied that he had recovered both dogs and both were in the back of his truck. Wubben followed up and asked specifically about the Lab, and Pals stated the dog was in a kennel in the back. Wubben testified that the kennel was not visible and that he never actually saw the Lab before stopping Pals’ vehicle. Based on this record, Wubben saw only one of the dogs in the truck at the time of the stop and consequently, did not know the location of the other dog that had been wandering around town in violation of the civil ordinance.
We therefore conclude that Wubben had probable cause under the Fourth Amendment to believe that an ongoing civil offense was occurring with respect to the Lab. We find the federal authorities cited above persuasive and come to the same conclusion with respect to Pals’ state constitutional claim under article I, section 8 of the Iowa Constitution.
C. Legality of Expansion of Seizure for Investigation Unrelated to Purposes of Stop. In Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984), the Supreme Court concluded that a traffic stop was more analogous to a Terry-type stop than a formal arrest. As a result, the federal courts and many state courts have sought to apply Terry principles in evaluating searches and seizures arising from traffic stops.
In Terry, the Supreme Court emphasized that even a frisk for weapons, which takes only a few seconds, is “a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment.” Terry, 392 U.S. at 17, 88 S.Ct. at 1877, 20 L.Ed.2d at 903. As a result, Terry emphasized that “[t]he scope of the search must be ‘strictly tied to and justified by’ the circumstances which rendered its initiation permissible.” Id. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904 (quoting Warden v. Hayden, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782, 794 (1967) (Fortas, J., concurring)). As a result, under traditional application of the exclusionary rule, “evidence may not be introduced if it was discovered by means of a seizure and search which were *776 not reasonably related in scope to the justification for their initiation.” Id. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910.
The scope of search and seizure limitations frequently arises where law enforcement has no reasonable suspicion to believe that criminal activity unrelated to the purposes of the underlying stop is afoot but the police expand their inquires into unrelated subjects. The federal courts are divided on the issue. Some federal circuit courts have held that reasonable suspicion of criminal activity for matters outside the scope of the purposes of a traffic stop is not required as long as the duration of the stop is not extended. See, e.g., United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir.2007) (upholding drug inquiry during traffic stop when duration of stop not extended); United States v. Hernandez, 418 F.3d 1206, 1209 n. 3 (11th Cir. 2005). Other circuits, however, have taken a somewhat different view. See, e.g., United States v. Blair, 524 F.3d 740, 752 (6th Cir.2008) (stating Terry-type stop must be reasonably related in scope to the circumstances which justified the interference in the first place); United States v. Henderson, 463 F.3d 27, 45 (1st Cir.2006) (holding the scope and duration must be reasonably related to the purpose of the vehicle stop).
Cases considering whether Terry-type limitations apply with respect to consent searches during traffic stops under state constitutional search and seizure provisions are mixed. The cases from a substantial number of state courts support the proposition that a seizure pursuant to a traffic stop must be limited in scope and that any effort to obtain consent for a search unrelated to the purpose of the stop requires at least reasonable suspicion of criminal activity. See, e.g., Brown v. State, 182 P.3d 624, 634 (Alaska Ct.App.2008); State v. Estabillio, 121 Hawai'i 261, 218 P.3d 749, 757-61 (2009); Commonwealth v. Torres, 424 Mass. 153, 674 N.E.2d 638, 641-43 (1997); State v. Fort, 660 N.W.2d 415, 419 (Minn.2003); State v. Carty, 170 N.J. 632, 790 A.2d 903, 908-09, modified, 174 N.J. 351, 806 A.2d 798 (2002); State v. McClendon, 350 N.C. 630, 517 S.E.2d 128, 132 (1999); McGaughey v. State, 37 P.3d 130, 137-41 (Okla.Crim.App.2001); State v. Cunningham, 183 Vt. 401, 954 A.2d 1290, 1298-1301 (2008). These cases cite the fear of potential abuse of traffic stops as nearly all vehicles, if followed for any substantial amount of time, commit minor traffic offenses that could serve as a springboard to intrusive consent searches.
Other states, however, have declined to impose a requirement that officers have reasonable suspicion unrelated to the traffic stop before they may request consent to search the vehicle. See, e.g., State v. Jenkins, 298 Conn. 209, 3 A.3d 806, 826 (2010); State v. Snell, 323 Mont. 157, 99 P.3d 191, 193 (2004); State v. Carbo, 151 N.H. 550, 864 A.2d 344, 346 (2004). These cases generally follow the federal approach in holding that consent searches in the context of traffic stops are valid provided that the duration of the seizure is not materially extended.
In light of the substantial split of authority over the issue of the proper scope of searches in the context of automobile stops, we requested supplemental briefing from the parties on the issue. In its response, the State argues that the issue was not properly preserved. In the district court, the defendant framed the issue as whether there was probable cause to conduct the search. The district court did not address the probable cause issue, finding that the consent was valid. Under the circumstances, the State argues that it was deprived of an evidentiary opportunity to present evidence that there was, in fact, sufficient particularized suspicion to sup *777 port the search. See DeVoss v. State, 648 N.W.2d 56, 63 (Iowa 2002). In light of the substantial question of preservation of error, we decline to address the issue.
D. Voluntariness of Consent. Pals argues that the district court erred in denying his motion to suppress because his consent to search the vehicle was involuntary. Specifically, Pals asserts that the totality of the circumstances, particularly the coercive nature of the traffic stop, demonstrate that his consent was not the product of a free and unconstrained choice. We agree with Pals.
1. Approach of the United States Supreme Court to consent searches. The starting point in the modern federal law of consent to search is Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In Schneckloth, the defendant was stopped by Officer James Rand who observed that one headlight and the license plate light were burned out on the vehicle. Schneckloth, 412 U.S. at 220, 93 S.Ct. at 2044, 36 L.Ed.2d at 858. Rand requested the six occupants to step out of the car. Id. After the occupants complied, two additional police officers arrived. Id. Rand then asked an occupant, who was the car owner’s brother, if he could search the car. Id. The occupant responded, “Sure, go ahead.” Id. While searching the car, the police found three checks that had been stolen from a carwash wadded up under the left rear seat. Id. at 220, 93 S.Ct. at 2044, 36 L.Ed.2d at 859. The defendant was charged with possessing a check with intent to defraud. Id. at 219, 93 S.Ct. at 2044, 36 L.Ed.2d at 858. In determining whether the consent search was valid, the Schneckloth Court considered whether consent in a search required a knowing and voluntary waiver of constitutional rights such as that required in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), which held that a waiver of the right to counsel in a federal trial was invalid unless the high standard of waiver was met. Id. at 235, 93 S.Ct. at 2051-52, 36 L.Ed.2d at 867.
The Supreme Court in Schneckloth concluded that the knowing and voluntary waiver standards of Zerbst did not apply in determining the validity of a consent search. Id. at 235-46, 93 S.Ct. at 2051-58, 36 L.Ed.2d at 867-74. The Schneckloth Court contrasted the right in Zerbst, which impacted a right designed to guarantee a fair trial and the reliability of the truth-determining process, with the right involved under the Fourth Amendment. Id.
Instead of requiring a Zerbst-type waiver, the Supreme Court held that the standard for determining the validity of a consent to search is whether the consent was voluntarily given and not a result of duress or coercion, expressed or implied. Id. at 247-48, 93 S.Ct. at 2058-59, 36 L.Ed.2d at 874-75. Voluntariness is a question of fact to be determined by all the circumstances. Id. at 248-49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875. “[W]hile the subject’s knowledge of a right to refuse is a factor to be taken into account,” it is not a prerequisite for obtaining voluntary consent. Id. at 249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.
The Schneckloth majority reasoned that a search authorized by consent may be the only means of obtaining important and reliable evidence. Id. at 227-28, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. Further, the majority stated that requiring a Miranda-type waiver in Fourth Amendment cases would be “thoroughly impractical.” Id. at 231-32, 93 S.Ct. at 2049-50, 36 L.Ed.2d at 865-66.
Justice Marshall dissented in Schneck-loth. Justice Marshall challenged the majority view that a suspect may relinquish a constitutional right without knowing that *778 he or she may refuse to accede to the police request. Id. at 284-90, 93 S.Ct. at 2077-80, 36 L.Ed.2d at 895-99 (Marshall, J., dissenting). The issue, according to Justice Marshall, was not whether the consent was “coerced,” but whether a citizen has chosen to exercise or forgo constitutional rights. Id. at 282-83, 93 S.Ct. at 2076, 36 L.Ed.2d at 894-95.
The Supreme Court considered the application of Schneckloth in the context of a traffic stop in Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). In Robinette, a motorist was stopped as a result of a speeding violation. Robinette, 519 U.S. at 35, 117 S.Ct. at 419, 136 L.Ed.2d at 352. The officer obtained Ro-binette’s driver’s license and determined, as a result of a computer check, that Robi-nette had no previous violations. Id. He then asked Robinette to step out of the car, issued a verbal warning, and returned the driver’s license. Id. At this point, the officer turned on his video camera and asked Robinette, “One question before you get gone: [A]re you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?” Id. at 35-36, 117 S.Ct. at 419, 136 L.Ed.2d at 352 (internal quotation marks omitted). After receiving a negative response, the officer asked for permission to search the car. Id. at 36, 117 S.Ct. at 419, 136 L.Ed.2d at 352. After Robinette consented, drugs were found pursuant to the search. Id.
Robinette challenged the search on the ground that his consent was not voluntary under Schneckloth. Id. at 35, 117 S.Ct. at 419, 136 L.Ed.2d at 352. The Ohio Supreme Court ruled that the search was invalid, holding that when a suspect is stopped for a traffic offense, he or she must be informed that they are free to go before an officer may engage in a consensual interrogation. Id. at 36, 117 S.Ct. at 419-20, 136 L.Ed.2d at 353.
The United States Supreme Court reversed. The majority of the Court held that there was no “per se” rule for volun-tariness in the setting of a traffic stop and remanded the case to the Ohio Supreme Court for further proceedings. Robinette, 519 U.S. at 39-40, 117 S.Ct. at 421, 136 L.Ed.2d at 354-55.
The majority opinion in Robinette drew two separate opinions. Justice Ginsburg concurred, but noted that the Ohio Supreme Court was free to establish a per se rule determining the voluntariness of consent searches in automobile stops on state constitutional grounds. Id. at 40-45, 117 S.Ct. at 422-24, 136 L.Ed.2d at 355-58 (Ginsburg, J., concurring). Justice Stevens dissented, explaining that he would affirm the judgment of the Ohio Supreme Court because the officers obtained the consent during an illegal detention. Id. at 51, 117 S.Ct. at 427, 136 L.Ed.2d at 362 (Stevens, J., dissenting). Further, Justice Stevens agreed with Justice Ginsburg that the Ohio Supreme Court could require officers to inform suspects that they are free to go before engaging in consensual interrogation under the Ohio Constitution. Id. at 51-52, 117 S.Ct. at 427-28, 136 L.Ed.2d at 362-63.
To some extent, the views of both Justice Stevens and Justice Ginsburg were vindicated when the case was remanded to the Ohio Supreme Court. On remand, the Ohio Supreme Court again found that the consent to search was involuntary. State v. Robinette (Robinette III), 80 Ohio St.3d 234, 685 N.E.2d 762, 771 (1997). The Ohio Supreme Court emphasized that it did not adopt a per se requirement that all motorists must be informed of their right to leave, but held under the totality of the circumstances in the case before it that the consent was invalid. Id. Further, the Ohio *779 Supreme Court clarified that its holding was based upon the search and seizure provisions of the Ohio Constitution. Id.
2. Independent state constiUitional approaches to voluntariness of consent searches. There is no question that state courts, as noted by Justice Ginsburg in Robinette, are free to develop their own search and seizure law under their state constitutions. See Ochoa, 792 N.W.2d at 267. This principle has been vividly illustrated in the aftermath of Schneckloth.
A number of state supreme courts have followed Schneckloth in deciding cases under their state constitutions. Many of these states, unlike Iowa, have adopted a lockstep approach whereby the constitutional decisions of the United States Supreme Court are deemed authoritative on matters of state constitutional law under similar constitutional provisions. See, e.g., Scott v. State, 366 Md. 121, 782 A.2d 862, 876-77 (2001); State v. Osborne, 119 N.H. 427, 402 A.2d 493, 497 (1979); Commonwealth v. Cleckley, 558 Pa. 517, 738 A.2d 427, 433 (1999); State v. Cox, 171 S.W.3d 174, 183-84 (Tenn.2005); State v. Rodgers, 119 Wis.2d 102, 349 N.W.2d 453, 459 (1984).
Several states, however, have rejected the Schneckloth approach and required that, in order for a search or seizure to be valid based on consent, the subject must provide a knowing and voluntary waiver under Zerbst. See, e.g., State v. Brown, 356 Ark. 460, 156 S.W.3d 722, 731-32 (2004) (concluding that officers performing knock-and-talk procedure must inform the subject of his or her right to refuse consent to the search); Penick v. State, 440 So.2d 547, 551 (Miss.1983) (holding the voluntariness requirement requires a showing that the defendant knew of his or her right to refuse); State v. Johnson, 68 N.J. 349, 346 A.2d 66, 68 (1975) (holding individual must have knowledge of right to refuse consent in order for consent to be deemed voluntary); State v. Ferrier, 136 Wash.2d 103, 960 P.2d 927, 932-33 (1998) (stating that, under state constitution, knock-and-talk procedure to acquire consent requires officers to inform the subject of his or her right to refuse consent).
Other states have not required a knowing and voluntary waiver, but have employed a Schneckloth-type “totality of the circumstances” test in a fashion more demanding than the United States Supreme Court. In Robinette III, for instance, the Ohio Supreme Court, by expressly stating that its Schneckloth-type analysis was based on state constitutional grounds, impliedly recognized that the United States Supreme Court could well have been less demanding in its application of the Schneckloth test. See Robinette III, 685 N.E.2d at 771-72. Such a relatively demanding approach to evaluating the “totality of the circumstances” might be characterized as Schneckloth “with teeth” test. See also State v. Nemeti, 472 N.W.2d 477, 478 (S.D.1991) (requiring the state to establish voluntariness “by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied”).
3. Iowa case law on consent searches. We have confronted the issue of voluntary consent in many search and seizure cases. We have not generally explored whether the court should adopt the Supreme Court’s Schneckloth standard under article I, section 8 of the Iowa Constitution or whether we should follow an independent path. In nearly all of our search and seizure cases involving consent, it appears that either the parties did not raise state constitutional claims, or if they did, they did not suggest that article I, section 8 of the Iowa Constitution should be given a different interpretation than the federal *780 counterpart. See Lane, 726 N.W.2d at 378-80 (holding that defendant’s girlfriend consented to search, but no mention of claim under Iowa Constitution); see also State v. Reinier, 628 N.W.2d 460, 467-69 (Iowa 2001) (holding that state failed to establish voluntary consent in the context of a “knock and talk” under the Fourth Amendment and article I, section 8 of the Iowa Constitution without an independent discussion of the Iowa Constitution); State v. Horton, 625 N.W.2d 362, 364 (Iowa 2001) (stating that search was not supported by consent under Schneckloth without discussing state constitution); State v. Manna, 534 N.W.2d 642, 643-44 (Iowa 1995) (discussing only the Fourth Amendment in determining whether the consent was voluntary); State v. Oakley, 469 N.W.2d 681, 683 (Iowa 1991) (same); State v. Myer, 441 N.W.2d 762, 765-66 (Iowa 1989) (same); State v. Folkens, 281 N.W.2d 1, 3-4 (Iowa 1979) (same); State v. Ege, 274 N.W.2d 350, 353 (Iowa 1979) (discussing Schneckloth without reference to article I, section 8); State v. Jones, 274 N.W.2d 273, 275-76 (Iowa 1979) (mentioning in passing article I, section 8 and citing, without analysis, Schneckloth for the proposition that valid consent is an exception to the warrant requirement); State v. Carter, 267 N.W.2d 385, 385 (Iowa 1978) (stating sole issue was constitutionality of consent search under Fourth Amendment); State v. Bakker, 262 N.W.2d 538, 546-47 (Iowa 1978) (discussing consent in context of Fourth Amendment only); Bettuo v. Pelton, 260 N.W.2d 423, 425-27 (Iowa 1977) (same); State v. Ahern, 227 N.W.2d 164, 165-67 (Iowa 1975) (mentioning only Fourth Amendment in applying Schneck-loth ).
In Reinders, however, we did consider claims brought under both the Fourth Amendment and article I, section 8 of the Iowa Constitution in a search and seizure case involving consent. Reinders, 690 N.W.2d at 81. The accused in Reinders was approached by police in a K-Mart parking lot. Id. at 80. After asking the accused about his activities and requesting identification, police asked for consent to search. Id. The court found the consent valid, noting that there was “no show of authority, no intimidation, and no use of physical force.... The officers simply engaged him in conversation and asked for identification.” Id. at 83. While the opinion states that the court found “no basis to distinguish the protections afforded by the Iowa Constitution,” it is not clear from the opinion precisely what distinctive arguments, if any, were raised on appeal. See id. at 82.
We have also considered the validity of consent in search and seizure cases involving automobiles. In State v. Smith, 217 N.W.2d 633, 634 (Iowa 1974), we were asked if a consent was voluntary during a traffic stop. In Smith, the defendant alighted from his car and approached the officers after being pulled over. Smith, 217 N.W.2d at 634. After reviewing the defendant’s driver’s license, an officer asked if the officers could search the car. Id. The search was found voluntary under Schneckloth. Id. at 635. Further, in a case prior to Schneckloth, we held that a consent to search during a vehicle stop was voluntary under the Fourth Amendment after the driver was asked to step out of the car even though the officer had drawn his gun when approaching the vehicle as a precaution in light of reports of an armed suspect. State v. Baych, 169 N.W.2d 578, 583 (Iowa 1969), overruled on other grounds by State v. Erickson, 362 N.W.2d 528, 530 (Iowa 1985).
4. Academic commentary on consent searches pursuant to traffic stops. The academic commentary on Schneckloth has been generally unfavorable and has attacked the basic premises of the decision *781 as applied in a traffic stop case. A number of commentators simply seem to side with Justice Marshall’s dissent, noting the irony in finding a “voluntary consent” even when the individual does not realize that he or she has a right to refuse. See Arnold H. Loewy, Knowing “Consent” Means “Knowing Consent”: The Under-appreciated Wisdom of Justice Marshall’s Schneckloth v. Bustamonte Dissent, 79 Miss. L.J. 97, 104-08 (2009).
Many of the academic commentators, however, also attack the lack of stringent application of the Sehneckloth test in the context of a traffic stop. See, e.g., Morgan Cloud, Ignorance and Democracy, 39 Tex. Tech L.Rev. 1143, 1160-61 (2007) (criticizing the Supreme Court’s application of Schneckloth in Florida v. Jimeno, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)); Eamon Kelly, Race, Cars and Consent: Reevaluating No-Suspicion Consent Searches, 2 DePaul J. for Soc. Just. 253, 258 (2009) (noting the broad discretion given to officers to utilize consent searches after Sehneckloth); Tracey Maclin, The Good and Bad Neivs About Consent Searches in the Supreme Court, 39 McGeorge L.Rev. 27, 57 (2008) (observing that post-Sehneckloth decisions have “transformed [Sehneckloth] from its self-described narrow, fact-specific holding to a' ruling that adopts a presumption of valid consent whenever the police ask for consent and there is assent”). Commentators have also criticized the “totality of the circumstances” test of Sehneckloth as lacking in predictability. For instance, Professor LaFave has noted that the voluntariness issue under the Fifth Amendment proved so problematic that Miranda warnings were required. 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2, at 51 (4th ed.2004). Professor LaFave sees the same problem in the context of the Fourth Amendment in light of “the inherent ambiguity” of the Sehneckloth test. Id. at 54; see also Marcy Strauss, Reconstructing Consent, 92 J.Crim. L. & Criminology 211, 220-21 (2002) [hereinafter Strauss] (characterizing the Sehneckloth test as vague and providing little guidance to courts).
Commentators have repeatedly noted that a traffic stop gives rise to an element of compulsion. See, e.g., Strauss, 92 J.Crim. L. & Criminology at 219 n. 29 (noting motorists are often asked for consent under “unfamiliar and intimidating” circumstances); Peter M. Tiersma & Lawrence M. Solan, Cops and Robbers: Selective Literalism in American Criminal Law, 38 Law & Soc’y Rev. 229, 243 (2004) [hereinafter Tiersma] (stating a request to search may be interpreted as an order to comply due to the “inherently coercive nature of a traffic stop”); Robert H. Whorf, Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique, 28 Ohio N.U. L.Rev. 1, 22 n. 121 (2001) [hereinafter Whorf] (citing the “overall coercive nature of the routine traffic stop” as a plausible explanation for the acquiescence to search); Erica Flores, Comment, “People, Not Places”: The Fiction of Consent, The Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops, 7 U. Pa. J. Const. L. 1071, 1081 (2005) [hereinafter Flores] (observing that a traffic stop creates “an inherently coercive environment”); Carla R. Kock, Note, State v. Akuba: A Missed Opportunity to Curb Vehicle Searches of Innocent Motorists on South Dakota Highways, 51 S.D. L.Rev. 152, 182 (2006) [hereinafter Kock] (“[T]he reality of traffic stops as state-sponsored exercises of power that contain inherently coercive elements deserves attention from the courts.”).
In addition, commentators have challenged the assumption of Sehneckloth that *782 providing a knowledge requirement could jeopardize the continued viability of consent searches. One study, after examining consent searches in Ohio, concludes that advising a motorist that he or she is free to leave or that the motorist was free to refuse to allow the search would not have a significant impact on the number of consent searches. Iliya Lichtenberg, Miranda in Ohio: The Effects of Robinette on “Voluntary” Waiver of Fourth Amendment Rights, 44 How. L.J. 349, 370-71 (2001); see also Steven L. Chanenson, Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches, 71 Tenn. L.Rev. 399, 465-66 (2004); Matthew Phillips, Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable, 45 Am. Crim. L.Rev. 1185,1201 (2008) [hereinafter Phillips].
Further, academic commentators also question whether giving appropriate warnings would be an unreasonable burden on law enforcement. While Schneckloth declares that such a requirement would be “thoroughly impractical,” Schneckloth, 412 U.S. at 231, 93 S.Ct. at 2050, 36 L.Ed.2d at 865-66, this assertion does not seem to be true. Indeed, police in New Jersey have been required to give such warnings in any routine traffic stop prior to seeking consent to search. See Phillips, 45 Am.Crim. L.Rev. at 1197-1206; see also James A. Adams, Search and Seizure as Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor, 12 St. Louis U. Pub.L.Rev. 413, 446-47 (1993); Eugene E. Smary, Note, The Doctrine of Waiver and Consent Searches, 49 Notre Dame L.Rev. 891, 903 (1974).
5. Determination of validity of consent searches under article I, section 8 in this case. In this case, we need not decide whether a knowing or intelligent waiver of search and seizure rights, such as that adopted in New Jersey, Washington, Mississippi, or Arkansas, is required to establish consent under article I, section 8 of the Iowa Constitution. An evaluation of such a per se requirement that police advise an individual of his or her right to decline to consent to a search, as is urged by LaFave and others, is reserved for another day.
Instead, we decide the case on a narrower ground. We hold, even if we apply an Iowa version of the Schneckloth-type “totality of the circumstances” test, the consent cannot be considered voluntary in this case under article I, section 8 of the Iowa Constitution.[10] Our analysis in this case is similar to that of the Ohio Supreme Court when it addressed the consent issue on remand from the United States Supreme Court in Robinette III.
First, we note that Wubben subjected Pals to a pat-down search, which included a command to empty Pals’ pockets, before detaining Pals in the police cruiser. There is nothing in the record to suggest that Wubben detected danger from Pals, who was stopped over a civil infraction. The pat-down search, however, projected authority over Pals and is a factor to be considered in determining the voluntariness of the search.
Second, we note that Pals was detained in the police vehicle at the time of the consent to search. We are thus not faced with a voluntary encounter in a public area, Reinders, 690 N.W.2d at 80, or an encounter on the familiar surroundings of the threshold of one’s home. Instead, Pals found himself seized in the front seat of a squad car with his own vehicle parked on *783 the side of a public highway. See United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) (stating that a person is “seized” within the meaning of the Fourth Amendment when, “in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave”). While the fact that a person is seized is not necessarily determinative under a totality of the circumstances test, Ahern, 227 N.W.2d at 166, we agree with the cases and commentators that view the setting of a traffic stop on a public road as inherently coercive. See Brown, 182 P.3d at 626 (stating motorists who have been stopped for a traffic violation do not act from a position of psychological independence); Robinette III, 685 N.E.2d at 771 (citing impliedly coercive nature of traffic stop); Strauss, 92 J.Crim. L. & Criminology at 219 n. 29; Tiersma, 38 Law & So e’y Rev. at 243; Whorf, 28 Ohio N.U. L.Rev. at 7 (citing coercion inherent in consent searches after routine traffic stops); Flores, 7 U. Pa. J. Const. L. at 1095; Kock, 51 S.D. L.Rev. at 182. In this setting, police plainly have the upper hand and are exerting authority in a fashion that makes it likely that a citizen would not feel free to decline to give consent for a search even though the search is unrelated to the rationale of the original stop.
Third, we note that Pals was never advised that he was free to leave or that he could voluntarily refuse consent without any retaliation by police. Under the Schneckloth-type approach, such a warning is not always required. Nonetheless, it still is an important factor in determining whether a consent to search is truly voluntary. The lack of any statement that Pals was free to leave or that he could decline to give his consent to the search in this case is, at a minimum, a strong factor cutting against the voluntariness of the search, particularly in the context of a traffic stop where the individual is seized in the front seat of a police car. See Brown, 182 P.3d at 634 (citing lack of statements that individual was free to leave or to decline consent to search as factors to find consent involuntary in traffic stop case). A warning of rights would serve to significantly neutralize the coercive setting in this case.
Fourth, Wubben had not advised Pals that he had concluded business related to the stop at the time he asked for consent. By not advising Pals that the business relating to the stop was concluded, Wub-ben conveyed the impression that Pals might receive more favorable treatment if he consented to the search. The lack of closure of the original pin-pose of the stop makes the request for consent more threatening. See id. at 631 (noting motorists have a “strong interest in catering to the officer’s wishes until the officer announces [his or her] decision whether to issue a citation or only a warning”); Carty, 790 A.2d at 908-09 (same); see also George E. Dix, Waiver in Criminal Procedure: A Brief for More Careful Analysis, 55 Tex. L.Rev. 193, 251-60 (1977) (citing anticipation of unfavorable exercise of official discretion as a factor in consent-to-search cases). If Wubben had advised Pals that he was free to go, the stop would have become a less coercive voluntary encounter.
In light of these factors, we conclude that the consent was not voluntary under article I, section 8 of the Iowa Constitution. To conclude otherwise would require us to give too much weight to words spoken by an individual and ignore the surrounding conditions strongly pointing to involuntariness of the consent.
The record in this case further demonstrates that there was no break be *784 tween the illegal action and the evidence subsequently obtained. As a result, there is no attenuation of the taint sufficient to avoid exclusion of the evidence obtained as a result of the unlawful search. Lane, 726 N.W.2d at 380-81; Reinier, 628 N.W.2d at 467 n. 3.
V. Conclusion.
For the above reasons, we conclude that the district court erred by refusing to grant Pals’ suppression motion. As a result, the judgment of the district court is reversed and the case remanded to the district court for further proceedings.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.
All justices concur except WATERMAN, J., who dissents, and MANSFIELD, J., who takes no part.

. Pals also asserts that he received ineffective assistance of counsel when his trial counsel failed to file a motion to dismiss on speedy trial grounds. Because we reverse the district court's judgment on other grounds, we need not address this issue. See State v. Bogan, 774 N.W.2d 676, 684 (Iowa 2009).

. See, e.g., David A. Harris, "Driving While Black” and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J.Crim. L. & Criminology 544 (1997); Eamon Kelly, Race, Cars and Consent: Reevaluating No-Suspicion Consent Searches, 2 DePaul J. for Soc. Just. 253 (2009) [hereinafter Kelly]; Wayne R. LaFave, The "Routine Traffic Stop” from Start to Finish: Too Much "Routine,” Not Enough Fourth Amendment, 102 Mich. L.Rev. 1843 (2004); David A. Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup.Ct. Rev. 271 (1997); George C. Thomas III, Terrorism, Race and a New Approach to Consent Searches, 73 Miss. L.J. 525 (2003); Robert H. Whorf, Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Dmg Interdiction Technique, 28 Ohio N.U. L.Rev. 1 (2001); Erica Flores, Comment, "People, Not Places”: The Fiction of Consent, the Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops, 7 U. Pa. J. Const. L. 1071 (2005).

. See Thomas Fusco, Annotation, Permissibility Under Fourth Amendment of Detention of Motorist by Police, Following Lawful Stop for Traffic Offense, to Investigate Matters Not Related to Offense, 118 A.L.R. Fed. 567 (1994) (collecting cases).

. See Consent Decree at 12, Wilkins v. Md. State Police, Civil Action No. CCB-93-468 (D.Md.2003), available at http://www. clearinghouse.ne1/chDocs/public/PN-MD-0003-0012.pdf; Consent Decree at ¶ 28, U.S. v. New Jersey, Civil No. 99-5970(MLC) (D.N.J. 1999), available at http://www.nj.gov/oag/ jointapp.htm.

. Studies in Illinois, Rhode Island, Minnesota, and by the Department of Justice have all shown that minority drivers are the subjects of consent searches at a far higher rate than whites even though consent searches of whites are more likely to produce contraband. See Kelly, 2 DePaul J. for Soc. Just, at 273-75.

. For example, in 2003, the California Highway Patrol (CHP) reached a class action settlement in a case alleging racial profiling. The agreement required the CHP to extend its self-imposed, preexisting moratorium on consent searches for an additional three years. Terms and Conditions of Settlement Agreement at 6, Rodriguez v. Cal. Highway Patrol, Case No. C 99-20895-JF/HRL (N.D.Cal.2003), available at www.aclunc.org/cases/ landmark_cases/asset_upload_file723_6239. pdf; see also David John Housholder, Reconciling Consent Searches and Fourth Amendment Jurisprudence: Incoiporating Privacy Into the Test for Valid Consent Searches, 58 Vand. L.Rev. 1279, 1302-03 (2005).

. See, e.g., Consent Decree at ¶ 28, U.S. v. New Jersey, Civil No. 99-5970(MLC) (D.N.J.1999), available at http://www.nj.gov/oag/jointapp. htm (providing that the New Jersey State Police would request consent to search a motor vehicle "only where troopers can articulate reasonable suspicion that a search would reveal evidence of a crime”).

. Consent Decree at 7, Wilkins v. Md. State Police, Civil Action No. CCB-93-468 (D.Md.2003), available at http://www.clearinghouse. neX/chDocs/public/PN-MD-0003-0012.pdf.

. Press Release, Iowa Civil Rights Commission, Racial Profiling Complaint Ends in Settlement with Iowa Law Enforcement Agency (April 13, 2011), available at www.state.ia.us/ government/crc/docs/RacialProfilingApril 2011.pdf. Iowa law enforcement authorities are aware of the problem of racial profiling and have taken measures to address the issue. In 2004, the Iowa Department of Public Safety held a series of community meetings regarding racial profiling. Iowa Department of Public Safety, Iowa's Highways and Racial Profiling: Community Conversations 5 (2004), available at http://www.dps.state.ia.us/ commis/pib/Releases/2004/full_report.pdf. The Department subsequently developed a number of recommendations to address the public’s concerns of racial profiling in Iowa. Id. at 14-15.

. Our holding is not based upon the Fourth Amendment of the United States Constitution, but on the independent grounds provided by article I, section 8 of the Iowa Constitution.