# IN THE COURT OF APPEALS OF IOWA

No. 21-1850
Filed March 8, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JEFFREY LEROY LARSON,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Bremer County, Peter B. Newell, District Associate Judge.

    Jeffrey Leroy Larson appeals the denial of his motion to suppress. **AFFIRMED.**

    Matthew G. Sease of Sease & Wadding, Des Moines, for appellant.

    Brenna Bird, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.

    Considered by Vaitheswaran, P.J., Tabor, J., and Scott, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**SCOTT, Senior Judge.**

After a trial on the minutes of evidence, Jeffrey Leroy Larson was convicted of first-offense possession of marijuana, in violation of Iowa Code section 124.401(5) (2020). On appeal, Larson challenges the denial of his motion to suppress, asserting the state trooper unreasonably prolonged the traffic stop. We affirm.

At about 3:30 p.m. on December 19, 2020, Iowa State Patrol Trooper John Iriarte stopped Larson's vehicle, which was traveling eighty-three miles per hour in a sixty-five mile per hour zone. Larson, his wife, and their dog were in the vehicle. Trooper Iriarte asked Larson to bring his license and registration to the patrol vehicle where Larson sat in the trooper's front passenger seat while the officer prepared a speeding citation. After about seven minutes, Trooper Iriarte—still working on the citation—asked Larson questions about whether there was anything illegal in Larson's vehicle—weapons, drugs, marijuana, meth, heroine, or "prescription pills that aren't yours?" Larson said no. Trooper Iriarte than asked, "If I wanted to search your vehicle, could I?" and Larson said, "Absolutely."

A couple minutes later, the officer completed inputting information in his patrol vehicle computer system, asked for Larson's signature, and explained how to take care of the speeding citation. Trooper Iriarte then gave Larson the citation and stated, "If you don't mind, I'm going to go ahead and just search your vehicle if it's okay with you still." Larson said, "Well, we'd like to get on the road but I can get the dog . . . ." Trooper Iriarte found marijuana when searching Larson's vehicle.

Larson challenged the search of his vehicle in the district court, asserting the trooper unlawfully prolonged the traffic stop and his consent was not voluntary. Trooper Iriarte testified at a hearing on the motion, and the patrol vehicle recordings of the traffic stop were admitted. The district court denied Larson's motion to suppress, finding the stop was not impermissibly extended and Larson's consent was voluntary. Larson appeals.

We review constitutional issues de novo. *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015). In reviewing the denial of a motion to suppress, we make "an independent evaluation of the totality of the circumstances as shown by the entire record." *Id.* (citation omitted). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Id.* (citation omitted).

"'[I]t is well settled that a traffic violation, however minor, gives an officer probable cause to stop a motorist' and is therefore a reasonable seizure." *State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019) (quoting *State v. Aderholdt*, 545 N.W.2d 559, 563–64 (Iowa 1996)).

> Once lawfully stopped, inquiries reasonably related to the mission of addressing the traffic infraction "and attend[ing] to related safety concerns" are permissible. This court has recognized, "[A] reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose."

*Id.* at 577–78 (alterations in original) (internal citations omitted).[1]

---

[1] Larson attempts to show his traffic stop was overly long by comparing it to a stop Trooper Iriarte made just prior. There, the trooper pulled someone over for heavily tinted windows, did not ask the driver to exit the vehicle, and issued a warning; that stop lasted about six minutes. Yet, in watching the patrol car video, we learn that during that stop, Trooper Iriarte is also alerted to a vehicle traveling at eighty-three

Authority for a traffic seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (alteration in original) (citation omitted). The *Salcedo* court noted: "*Rodriguez* made clear the Fourth Amendment will tolerate certain unrelated investigations that do not extend the roadside stop, but the stop will remain lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" 935 N.W.2d at 579.

On our de novo review, we find Larson's detention lasted no longer than necessary to prepare and issue the traffic citation. It is true Trooper Iriarte asked Larson questions during that time period concerning Larson's destination and purpose and the existence of weapons or drugs in the vehicle, but those questions did not measurably extend the duration of the stop.

While Trooper Iriarte was preparing the traffic citation, Larson informed the trooper he could "absolutely" search the vehicle—the trooper had not yet completed issuing the citation. When the trooper handed the citation to Larson, Larson again consented—admittedly less enthusiastically—to the search. "[C]onsensual searches are a well-established exception to the warrant requirement and do not violate the Federal or State Constitution." *State v.*

---

miles per hour. He appears more concerned about the speeding vehicle than the tinted windows, noting the occupants of the stopped vehicle had already received an earlier warning. As soon as he issued the warning, he pursued the speeding vehicle, which turned out to be Larson who had continued to speed. We are not convinced the length of that earlier traffic stop provides an apt benchmark.

*Hauge*, 973 N.W.2d 453, 461 (Iowa 2022). Larson, however, contends the circumstances of his traffic stop require a finding that Larson's consent was not voluntary. He relies on *State v. Pals*, 805 N.W.2d 767 (Iowa 2011), claiming almost identical circumstances exist here. We cannot agree.

Our supreme court has recently described the circumstances that led to the *Pals* court finding the consent was not voluntary:

> There, a law enforcement officer conducted a traffic stop of Pals to enforce a municipal ordinance. When Pals was unable to produce proof of insurance, the officer asked Pals to come back to his patrol car. The officer subjected Pals to a pat-down search before detaining Pals in the patrol car, where Pals sat in the front passenger seat while the officer informed Pals that he needed to update the address on his driver's license, warned him about the municipal infraction he had violated, and instructed him to call the sheriff's office with his insurance policy information to alleviate the need for a no-insurance ticket. After Pals agreed to do so, the officer asked Pals, "Say you don't have anything, any weapons or drugs or anything like that in your vehicle, do you? Do you care if I take a look?" Pals responded, "[S]ure, go ahead." The search of the vehicle revealed marijuana, which led to Pals's conviction for possession of a controlled substance after the district court denied his motion to suppress the evidence.
>
> On appeal, a majority of our court concluded that Pals did not voluntarily consent to the search of his vehicle under article I, section 8 of the Iowa Constitution. The majority considered four factors, including the "projected authority" the officer exerted over Pals during the pat-down search and the "inherently coercive" setting of Pals's detainment in the police vehicle on the side of a public highway. Additionally, it observed that the officer had not advised Pals that the officer had "concluded business related to the stop at the time he asked for consent," which would have made the stop "a less coercive voluntary encounter," and the "lack of closure of the original purpose of this stop makes the request for consent more threatening." Finally, the majority asserted,
>
>> The lack of any statement that Pals was free to leave or that he could decline to give his consent to the search in this case is, at a minimum, a strong factor cutting against the voluntariness of the search, particularly in the context of a traffic stop where the individual is seized in the front seat of a police car. A

> warning of rights would serve to significantly neutralize the coercive setting in this case.

*Hauge*, 973 N.W.2d at 466–67 (internal citations omitted).

Trooper Iriarte asked Larson to join him in the patrol vehicle, which is recognized as part of a reasonable investigation. *See Salcedo*, 935 N.W.2d at 577. Larson was not subjected to a pat-down search before he entered the patrol vehicle. He sat in the front passenger seat while the trooper worked on his computer next to him. The time between when the trooper made the traffic stop and when he asked Larson for consent to search was only a matter of a few minutes. During their interaction, Larson made small talk, asked questions of the trooper, and laughed on occasion. The trooper was conversational and calm. Nothing in the record suggests Larson was not of sound mind or too impaired to consent. *See Hauge*, 973 N.W.2d at 469. Viewing the totality of the circumstances, Larson's behavior was consistent with consent, and the interaction between Larson and Trooper Iriarte was "fairly benign leading up to the request to search." *See id.* We agree with the district court, Larson's consent was given voluntarily. There was no error in denying the motion to suppress.

**AFFIRMED.**

Vaitheswaran, P.J., concurs; Tabor, J., dissents.

**TABOR, Judge** (dissenting).

In deciding whether consent to search is voluntary, "account must be taken of subtly coercive police questions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973). Because the majority's analysis does not do that, I respectfully dissent.

The State has the burden to prove that Larson gave his consent to search "freely and voluntarily." *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *see also State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993) (noting consent must be "unequivocal" and "specific"). The State can't discharge its burden by showing that Larson merely submitted to the trooper's cleverly phrased questions. *Cf. Bumper*, 391 U.S. at 548–49 ("This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."). And we must remember that the trooper is asking questions within "the 'inherently coercive' setting of a traffic stop." *State v. Lowe*, 812 N.W.2d 554, 575 n.11 (Iowa 2012) (citations omitted).

Moving to those questions. The first inquiry was hypothetical on its face: "If I wanted to search your vehicle, could I?" The word "if" usually means "in the event that" or "on the condition that." *If*, Meriam-Webster.com, https://www.merriam-webster.com/dictionary/if (last visited Feb. 14, 2023); *see Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 233 (2011) (noting word "if" is a "conditional term" in construing statute). The trooper did not say: "I would like to search your car; do I have your consent?" *See U.S. Commodity Futures Trading Commn. v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1321 (11th Cir. 2018) (differentiating between direct statement, "I would like to deliver metal" and abstract inquiry, "If I wanted to deliver

metal, can you arrange it?"). Instead, the trooper's question was conditional and did not secure voluntary consent.

Yet the majority seems convinced by Larson's immediate response: "Absolutely." But what did Larson think the trooper was asking? Viewed under the totality of circumstances, a reasonable layperson in Larson's position might have believed the trooper was probing Larson's understanding of the trooper's authority to search ("if I wanted to, could I?"), rather than seeking Larson's consent. The wording of the question did not refer to Larson at all. *Cf. State v. Hauge*, 973 N.W.2d 453, 456 (Iowa 2022) ("Can I check *you* for weapons real quick?") (emphasis added); *State v. Pals*, 805 N.W.2d 767, 770 (Iowa 2011) ("Do *you* care if I take a look?") (emphasis added). And context is important here. The trooper had just exerted his authority over the out-of-state Larson in several ways: by stopping Larson's car, by removing Larson from his own car and detaining him in the patrol car, and by questioning where Larson was going and whether he had controlled substances in his car.[2] *See In re Prop. Seized from Pardee*, 872 N.W.2d 384, 396 (Iowa 2015) (denouncing practice of "blending" drug interdiction questions with the routine processing of a traffic stop). It would be reasonable for a layperson to believe that given the trooper's control over the stop that he was just verifying that Larson knew he had authority to search "if he wanted to." Indeed, "[s]ubtle coercion, in the form of an assertion of authority . . . by the law enforcement officers [can] make what appears to be a voluntary act an involuntary

---

[2] Larson told the trooper that he and his wife and their four-year-old chocolate lab were traveling from west central Minnesota to visit their adult children in South Carolina and Florida. Larson denied having any illegal drugs in the car.

one." *State v. Reinier*, 628 N.W.2d 460, 468 (Iowa 2001) (alterations in original) (citations omitted).

Even if, as the majority believes, Larson "absolutely" gave the trooper consent to search the car—if the trooper wanted to—the trooper didn't want to at that point. The question's conditional language confuses its meaning. Larson may have understood the phrase "if I wanted to, could I" to mean that the trooper would first manifest a "want" to do so before asking Larson to consent. *Cf. Belmont Constructors, Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d 352, 357 (Tex. App. 1995) (explaining "[c]onditional language, such as 'if'" conveys a "condition precedent" when interpreting city charter). But not until four minutes later did the trooper revisit the idea of a search.[3]

Which brings me to his second question: "Um, if you don't mind, I'm going to go ahead and just search your vehicle, if that's okay with you, still?" This question assumed consent was a fait accompli. And unlike Larson's unreserved response to the first hypothetical question, he hesitated after hearing the trooper's declaration that he was "going to go ahead and just search." Larson did not confirm that he had previously given consent and did not give affirmative consent in response to that second question. Instead, Larson told the trooper: "I guess we'd like to get on the road, but, ah, the dog's in there like I said, but I can bring her out." This is not an unequivocal answer. *See Howard*, 509 N.W.2d at 767.

Under the totality-of-circumstances test dictated by *Schneckloth* and *Hauge*, the State did not prove that Larson voluntarily consented to the search of

---

[3] During those four minutes, the trooper finished issuing the speeding citation to Larson. And he asked Larson if his dog was kenneled or loose in the car.

his car. *Schneckloth* requires us to "carefully scrutinize[]" the conditions that led to the consent in determining whether it was voluntary. 412 U.S. at 248. One of those conditions is the "projected authority" that the officer displays over the citizen. *Hauge*, 973 N.W.2d at 466 (quoting *Pals*, 805 N.W.2d at 782). Our supreme court found it significant that the deputy "displayed limited authority over Hauge prior to asking him if he had any weapons on him and whether he could check Hauge for weapons." *Id.* at 468. By contrast, the trooper detained Larson in his patrol car and quizzed him about his itinerary and whether he had contraband in his car. *See State v. Lane*, 726 N.W.2d 371, 379 (Iowa 2007) (considering length of detention and questioning when deciding whether consent was voluntary). Before completing the citation process and while still detaining Larson, the trooper asked if he could search Larson's car "if he wanted to" and secured Larson's positive response to that hypothetical question.

After issuing the speeding ticket, the trooper did not tell Larson he was free to go or could decline to give consent. That lack of notice is another factor in assessing voluntariness. *See Schneckloth*, 412 U.S. at 249 (noting "subject's knowledge of a right to refuse is a factor to be taken into account"). Instead, after handing Larson the ticket, the trooper unveiled his plan to search the car: "[I]f that's okay with you, *still*." That phrasing put Larson in the position of contradicting the trooper who just professed to having authority to continue the road-side seizure. In response, Larson neither confirmed nor contradicted the trooper's plan to search. His compliance did not signal unequivocal consent. These circumstances are "at a minimum, a strong factor cutting against the voluntariness of the search,

*particularly* in the context of a traffic stop where the individual is seized in the front seat of a police car." *Pals*, 805 N.W.2d at 783 (emphasis added).

The majority finds no coercion in the trooper's questions because "[d]uring their interaction, Larson made small talk, asked questions of the trooper, and laughed on occasion." But the superficial bonhomie of the encounter did not excuse the trooper's calculated effort to extract consent without truly asking for it. "[N]o matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth*, 412 U.S. at 228.

Here, the coercion came in the form of a two-step strategy. *Cf. Missouri v. Seibert*, 542 U.S. 600, 616 (2004) (finding *Miranda* violated by police technique to conduct interrogation in two phases, one unwarned and one warned). The trooper's first question enticed Larson to answer yes because it carried no immediate consequences. The trooper's second question banked on the motorist's reluctance to deny the trooper's assertion that he had already consented. *Cf. id.* at 613 ("[W]ith one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble."). Our record does not show if the trooper's technique stemmed from training. But I hope not. In analyzing consent searches, we try to strike a balance between the competing interests of legitimate, effective police practices and "society's deep fundamental belief that the criminal law cannot be used unfairly." *Hauge*, 973 N.W.2d at 464 (quoting *Lowe*, 812 N.W.2d at 572). Posing questions to trick a motorist into giving consent is an unfair use of the criminal law.

It is our duty as a court to be "watchful of the constitutional rights of the citizen, and against any stealthy encroachments thereon." *See Schneckloth*, 412 U.S. at 229 (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)). When citizens consent to a police search, they forgo a constitutional right. *Id.* at 245. I believe that the trooper's method of obtaining consent to search was a stealthy encroachment on Larson's constitutional right. Because the State failed to show that Larson voluntarily consented to the search of his car, I would reverse the denial of his motion to suppress.