# IN THE COURT OF APPEALS OF IOWA

No. 16-0117
Filed September 13, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**LEIGH LAZ LEPON,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Story County, Michael J. Moon, Judge.

The defendant appeals from his conviction for murder in the second degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Leigh Laz LePon, Fort Madison, pro se.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, Judge.**

Leigh LePon appeals from his conviction for murder in the second degree. LePon raises a number of claims of error, both through his appellate attorney and pro se. He maintains: (1) the charges against him should have been dismissed due to violation of the speedy-indictment rule; (2) the district court was wrong to deny his motion to suppress; (3) his constitutional rights were violated when the district court allowed the State to dismiss some of the charges against him before trial; (4) the district court abused its discretion in allowing the assistant medical examiner to testify about the manner of death, Sadie Book to testify about LePon's prior bad acts—his use of methamphetamine on the night in question, and the State's expert Kenneth Martin to testify at all; (5) the court should have granted LePon's motion for mistrial after the medical examiner testified the type of wound suffered by the deceased "usually implies intent"; (6) the court erred in finding there was sufficient evidence to support the malice-aforethought element for murder; (7) an evidentiary hearing is warranted to investigate his allegations of prosecutorial misconduct; and (8) trial counsel was ineffective for failing to recall Book in order to establish her bias before the jury and for failing to challenge the weight of the evidence.

**I. Background Facts and Proceedings.**

On December 20, 2013, at approximately 10:30 p.m., LePon called 911 and reported that his friend, Devlin Lockman, had accidentally shot himself in the face. LePon stated Lockman was intoxicated and had been playing with the gun—moving it from hand to hand—when it discharged. Sadie Book, LePon's girlfriend at the time, was also at the residence when the gun discharged.

Police and medical responders arrived shortly after the 911 call was received; Lockman was conscious, though bleeding heavily from the face and unable to be understood due to the wounds suffered to his face, mouth, and tongue. When directed or asked to do so, LePon assisted medical efforts by holding a towel to Lockman's face to stem the bleeding. Lockman was placed in the ambulance so he could be taken to the hospital; he suffered cardiac arrest during the drive and was later pronounced dead.

Both LePon and Book rode with police officers to the local police station on the night in question. They were kept in separate rooms and asked a variety of questions about what had taken place. Book told officers she saw Lockman with the gun and heard it discharge but that she had not witnessed what actually occurred because she was looking at her tablet at the time. She also reported LePon had immediately called 911. LePon told officers that Lockman had a history of playing with guns when he was drunk, including a previous incident when he had accidentally shot through the leg of his pants into the floor. He reported Lockman had been waving the gun around and then threatened LePon with it; LePon denied feeling threatened but claimed he wanted Lockman to put the gun down. He stated he had reached out to grab Lockman's arm, and that is when the gun had discharged. While LePon was being interviewed, he received a call on his cell phone. The caller informed him Lockman had died. Shortly after, LePon ended the interview with police.

Officers applied for and obtained a warrant in the early morning hours of December 21. The items to be searched and seized included LePon's clothing and his cell phone. Book and LePon ultimately left the station together, but

officers first downloaded the content from both of their phones and took LePon's clothing that had blood on it.

The Deputy State Medical Examiner, Dr. Michelle Catellier, performed the autopsy of Lockman's body on December 22. She had received an initial report from the medical legal death investigator, as well some statements from police officers, that the shooting was the result of the accidental discharge of a gun. Dr. Catellier did not believe the wounds were consistent with the initial findings, including what she termed a "hard contact wound" on Lockman's face. She asked the officers to allow her to study the gun, and she indicated to them that she thought further investigation was needed.

On January 1, 2014, Book went back to the police station. During her second interview, she again reported the shooting was an accident, but she also reported that she had more to tell the officers but was scared to do so while LePon was not in jail.

On January 3, LePon was arrested on charges of willful injury causing bodily injury, domestic abuse assault impeding air/blood flow, and two counts of violation of a no-contact order for actions he allegedly perpetrated against Book on New Year's Eve. The same day, Book went to the police station for a third interview. She told officers for the first time that she witnessed LePon shoot Lockman.

In early February, the medical examiner ruled Lockman's death a homicide. Shortly thereafter, LePon was arrested for murder in the first degree. The State then dismissed the other charges against LePon from the New Year's Eve incident.

LePon's trial did not take place until November 2015. In the months leading up to trial, the court was asked to decide a number of motions in limine and motions to suppress.

At trial, Book testified that on the night of December 20, she had witnessed LePon pick up the handgun and walk toward Lockman, who was sitting on the couch; heard the safety click into the "off" position; and then saw a brief struggle between Lockman and LePon before she heard the gun go off and saw Lockman slump backward. She was allowed to testify—over defense objection—that she and LePon had been using methamphetamine for approximately two days before the shooting occurred. Other witnesses for the State included LePon's former cellmate, who testified LePon had told him he "shot his best friend in the face" because he had been fighting with his girlfriend and felt like his best friend took the girlfriend's side. Additionally, over objection, Dr. Catellier was allowed to testify that the manner of death was homicide, and the State was allowed to call an expert witness to analyze the blood spatter on the couch where Lockman was sitting at the time of the shooting. The State also offered into evidence LePon's phone records, which the State had obtained from the phone company pursuant to a warrant, showing LePon called a cab approximately thirty-eight seconds before he called 911 on December 20.

The defense called an expert witness, who provided testimony about how many pounds of pressure it would take for the gun in question to discharge—attempting to explain how easily an accidental discharge could occur—and an expert forensic pathologist, Dr. Thomas Young, who disagreed with the medical examiner's conclusion that Lockman suffered a "hard contact wound" and,

accordingly, the distance that would have had to exist between Lockman's face and the gun when it fired.

The jury found LePon guilty of the lesser-included offense of murder in the second degree, and he was ultimately sentenced to a term of incarceration not to exceed fifty years.

LePon appeals.[1]

## II. Discussion.

### 1. Speedy Indictment.

LePon maintains the charges against him should have been dismissed pursuant to the speedy-indictment rule contained in Iowa Rule of Criminal Procedure 2.33(2)(a). He argues because he was seized on the night of the shooting—December 20, 2013—and the filing of the trial information did not take place until February 25, 2014, he was not charged within the forty-five days set by the rule.[2] "We review interpretations of the speedy indictment rule for errors at law." *Williams*, 895 N.W.2d at 860.

Prior case law provided the speedy-indictment rule was triggered when "a reasonable person in the defendant's position would have believed an arrest occurred, including whether the arresting officer manifested a purpose to arrest." *State v. Wing*, 791 N.W.2d 243, 249 (Iowa 2010), *overruled by Williams*, 895 N.W.2d at 867. But now, "[t]he rule is triggered from the time a person is taken

---

[1] Other facts and parts of the proceedings will be discussed in more detail, as necessary, below.

[2] We note LePon's appellate briefs were filed before our supreme court decided *State v. Williams*, 895 N.W.2d 856, 866 (Iowa 2017), which changed our understanding of the speedy-indictment rule.

into custody, but only when the arrest is completed by taking the person before a magistrate for an initial appearance." *Williams*, 895 N.W.2d at 867.

LePon was arrested pursuant to an arrest warrant on February 14, 2014.[3] He had his initial appearance in front of a district court judge on February 17; it was then the speedy-indictment clock began to run. LePon was charged by trial information with murder in the first degree on February 25. Based on our current understanding of the speedy-indictment rule, LePon was charged well within the forty-five days required by Iowa Rule of Criminal Procedure 2.23(2)(a).

**2. Motion to Suppress.**

LePon maintains the district court should have granted his motion to suppress. Before trial, he argued for the suppression of the statements he made to police on December 20 after he was taken to the station; the evidence obtained at the station—his clothing and the information from his cell phone; the later, second recovery of his cell phone on January 10, 2014; and the search of his cell phone records. As he did in his motion to suppress, LePon argues for the suppression of various pieces of evidence under different theories. We will address each below; "[b]ecause the motion to suppress is based on a claim of deprivation of the defendant's constitutional rights against unlawful seizures, this court's review is de novo." *State v. Wilkes*, 756 N.W.2d 838, 841 (Iowa 2008). We make an independent evaluation of the circumstances as shown by the entire record, considering both the evidence introduced at the suppression hearing and the evidence introduced at trial. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).

---

[3] LePon was already in custody on other charges at the time of his arrest.

**A. Alleged Seizure of LePon's Person.** LePon maintains he was illegally seized on December 20, 2013, when officers transported him to the police station. The State responds that LePon voluntarily accompanied police to the station to give a statement.

"The Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution protect persons from unreasonable searches and seizures." *State v. Reinders*, 690 N.W.2d 78, 81 (Iowa 2004). "The Fourth Amendment's protection against unreasonable intrusions on a person's liberty arises when an officer seizes a person. A seizure occurs when an officer by means of physical force or show of authority in some way restrains the liberty of a citizen." *Id.* at 82 (citations omitted). "[A] seizure does not occur if 'a reasonable person would feel free to disregard the police and go about his business.'" *Wilkes*, 756 N.W.2d at 843 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "[O]bjective indices of police coercion must be present to convert an encounter between police and citizens into a seizure." *Id.* We determine whether a seizure occurred by the totality of the circumstances. *Id.*

LePon has not claimed that an officer used physical force to seize him. Rather, he maintains the officers' show of authority made him feel as if he was not free to refuse to go to the police station or to leave after he arrived there. Specifically, LePon points to his statements that he wanted to be with Lockman at the hospital and two officers' testimony that if LePon had tried to leave, they would have contacted a superior before allowing him to do so.

During the hearing on LePon's motion to dismiss charges (based on the speedy-indictment rule), when trying to convince the court he had been "in

custody" on December 20, LePon testified that when he was standing outside the station smoking a cigarette waiting to be interviewed by a detective, he "began to walk away on two occasions" and "[a]n officer—I'm not sure who it was—came from around the back side of a vehicle and told me I had to go back to the door of the police station." LePon clarified that the officer did not touch him but stated he was "herded" back toward the door and the officer used an "authoritative" or "directive" tone. The district court did not include LePon's version in its finding of facts. Rather, the court found LePon had "consented to be interviewed at the police station, was not handcuffed or locked in a room, was told he was not under arrest, was *Mirandized*,[4] took a personal call, was given a break when requested, and was allowed access to Book when requested."[5] In its ruling on the motion to suppress, the court found LePon "was never threatened by police, the police never displayed their weapons or indicated that they would compel him to submit to their request if he refused to accompany them to the police station, and the police gave no other objective indication that he was not free to leave." While we are not bound by the district court's findings, our de novo review of the record has not led us to find otherwise. *See State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003) (stating that we make an independent evaluation of the totality of the circumstances as shown by the entire record, but "we give deference to

---

[4] *See Miranda v. Arizona*, 384 U.S. 436, 445 (1966).

[5] We acknowledge the district court made these findings while determining whether LePon was "in custody" pursuant to Fifth Amendment case law rather than "seized" pursuant to Fourth Amendment case law. The district court was asked to decide the issue of whether LePon was in custody before it was asked to rule on the motion to suppress. At the hearing on the motion to suppress, the State maintained "custody is once again an issue," claimed "the Court's prior ruling appears to be directly applicable to the hearing in this case," and asked the court to "take judicial notice of that prior ruling for the purposes of this motion to suppress." Additionally, we may consider the entire record when reaching our conclusions. *See Tyler*, 867 N.W.2d at 152.

the district court's findings due to its opportunity to assess the credibility of witnesses").

Additionally, while LePon expressed his desire to be with Lockman at the hospital, we note that on the video of the police interview, LePon was told the door of the room was not locked, he could take a break at any time, he was free to remain silent or not give a statement, and that he was not under arrest or being charged with anything. In response, LePon did not get up and leave the room to join Lockman at the hospital; instead, he interrupted while the detective was telling him his rights, apparently eager to tell the officer about the incidents of the night. Also, it was LePon who determined when the interview was over.

While one officer testified he would have checked with a superior before letting LePon leave the scene or the police station and another testified he would have prevented LePon from doing so, both testified that LePon did not actually try to leave and they never informed him of their intent to stop him. *Cf. Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (discussing whether a defendant is in custody for purposes of the Fifth Amendment and noting that an officer's "unarticulated plan has no bearing on the" issue because "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

We agree with the district court that a reasonable person in LePon's shoes would have believed he was free to choose not to go to the police station with officers and to leave the station at any time after he arrived there. Thus, he was not seized in violation of his constitutional rights.

**B. Consent to Seizure of Clothing.** The district court denied LePon's motion to suppress regarding the items seized from him at the police station in the early morning hours of December 21, 2013—his clothing—finding that he consented to the seizure when he gave the items to the police.[6] LePon asks us to reconsider the district court's ruling and apply a more stringent standard for consent under article I, section 8 of the Iowa Constitution.

Consent is an exception to the warrant requirement. *See State v. Howard*, 509 N.W.2d 764, 766 (Iowa 1993). In the context of the Fourth Amendment, consent is valid when it "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 247–48 (1973). "'[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account,' it is not a prerequisite for obtaining voluntary consent." *State v. Pals*, 805 N.W.2d 767, 777 (Iowa 2011) (quoting *Schneckloth*, 412 U.S. at 249). This is a less-stringent standard than is required to waive other constitutional rights—such as waiving the right to counsel, which requires the party's waiver to be both knowing and intelligent. *See Schneckloth*, 412 U.S. 235–38 (discussing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). In other words, the defendant or waiving party must be informed of the right they are relinquishing.

---

[6] At the same time, the officers also seized LePon's phone. They downloaded the content and then returned it to him before he left the station on the morning of December 21, 2013. LePon's appellate brief refers to both his cell phone and his clothing throughout his arguments on suppression, but we note that the State agreed not to introduce the contents of his cell phone before the suppression hearing. This agreement did not extend to the information the State received from the cell phone records obtained from the cell phone company regarding ingoing and outgoing calls, among other things.

LePon maintains we should interpret article I, section 8 of the Iowa Constitution to require that a defendant consenting to the search or seizure of himself or his property be first informed of his right to refuse. He notes that our supreme court raised the issue in *Pals* before concluding it was unnecessary to resolve the issue. 805 N.W.2d at 782. Our supreme court "reserved [the question] for another day" and heretofore has not interpreted the Iowa Constitution in the way LePon invites us to do. *Id.* It is the role of the supreme court to interpret the Iowa Constitution; thus, we decline to reconsider LePon's claim using a more-stringent standard under the Iowa Constitution. *See State v. Ochoa*, 792 N.W.2d 260, 268 (Iowa 2010) ("[W]hile United States Supreme Court cases are entitled to respectful consideration, [the Iowa Supreme Court] will engage in independent analysis of the content of our state search and seizure provisions.").

LePon maintains that even if we do not apply the standard for which he advocates, we should still find that his consent to give the police his clothing was not voluntary under the totality of the circumstances. We agree with LePon. At the hearing on the motion to suppress, the officer who requested LePon turn over his clothes testified that at the time she asked him for the items, she advised him that she had a search warrant for them.

While the officer purportedly asked LePon to consent to the seizure of his clothing, because she did so while also telling him she had a warrant that gave her authority to seize such items, we cannot say his consent was voluntary. The State has the burden to prove the consent was "freely and voluntarily given." *Id.* at 292. That "burden 'cannot be discharged by showing no more than

acquiescence to a claim of lawful authority.'" *Id.* (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968)). Furthmore, "[a] search conducted in reliance upon an officer's claim of lawful authority cannot be justified on the basis of consent if the claim of authority turns out to be invalid." *Id.* Thus, we must determine whether the officer's lawful authority—the warrant—was valid.

We note that in its ruling on the motion to suppress, the district court found the seizure of LePon's clothing was consensual and not done pursuant to the search warrant because the seizure of LePon's clothing took place "thirty minutes before the magistrate signed the warrant authorizing the seizure." We disagree with the district court's findings. While the search warrant log contains a handwritten note that LePon's clothes were seized at "00:55," or 12:55 a.m., on December 21 and the warrant was not signed until 1:25 a.m. on December 21, the officer who seized the clothing testified she is "numerically challenged." She claimed she misread the clock and it "didn't dawn on [her] that [she] was off an hour" when she filled out the log. She testified that she actually seized the clothing at 1:55 a.m. Her testimony is corroborated by the fact that the recorded interview of LePon in the police station was time stamped; at 12:55 a.m, LePon was still seated with the detective giving an interview—not handing over his clothing. Additionally, there is video of LePon still wearing the clothing that was ultimately seized as late as 1:07 a.m.[7]

LePon makes several general claims about the validity of the warrant. We "generally endorse[] the warrant-preference requirement," and "we do not strictly

---

[7] Additional footage of LePon exists until almost 1:25 a.m.—the time the search warrant was signed—but that portion of the video does not show LePon's legs, so we cannot be sure whether his jeans had yet been seized.

scrutinize the sufficiency of the underlying affidavit." *State v. McNeal*, 867 N.W.2d 91, 100 (Iowa 2015) (quoting *Ochoa*, 792 N.W.2d at 285). "[A]s a reviewing court, we do not independently determine probable cause and instead 'merely decide whether the issuing judge had a substantial basis for concluding probable cause existed.'" *Id.* (quoting *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997)). "[W]e draw all reasonable inferences to support the judge's finding of probable cause and give great deference to the judge's finding. Close cases are decided in favor of upholding the validity of the warrant." *Id.* (citations omitted).

LePon claims that because there was no reason for the officers to believe the shooting was anything other than accidental, there was no probable cause to believe a crime had occurred. While the two eyewitnesses—or possible suspects—immediately told officers the shooting was accidental, that does not prevent the issuing judge from finding probable cause existed to believe a crime may have occurred. "Probable cause exists for the issuance of a search warrant 'when the facts and circumstances presented to the judicial officer are sufficient in themselves to justify the belief of a *reasonably cautious person* that an offense has been or is being committed.'" *State v. Leto*, 305 N.W.2d 482, 485 (Iowa 1981) (emphasis added) (citation omitted). Here, the affidavit informed the issuing judge, among other things, that police had responded to a report of a person with a gunshot wound to the head, LePon had been present at the time of the shooting, and his clothing had blood on it. While LePon immediately reported his own innocence to the police, there is substantial basis for a reasonably

cautious person to believe a crime had been committed. Moreover, there is a clear nexus between LePon's bloody clothing and the shooting.[8]

Here, we find the search warrant for LePon's clothing was valid, and the seizure of the items took place pursuant to the warrant. The district court properly denied the suppression of the evidence of LePon's clothing. *See King v. State*, 818 N.W.2d 1, 11 (Iowa 2012) ("[B]ecause both grounds were duly raised before the trial court, we could affirm on either ground even if it were not argued before us."). Moreover, even if the bloody clothing was seized unconstitutionally, any error was harmless because the evidence was not incriminating. *See State v. Walls*, 761 N.W.2d 638, 686 (Iowa 2009) ("Harmless-error analysis looks to the basis on which the jury's verdict actually rested. 'To establish harmless error, the State must "prove beyond a reasonable doubt that the error complained of did not contributed to the verdict obtained."'" (citations omitted)). A number of officers testified LePon assisted Lockman while he was bleeding heavily, with one officer describing LePon's actions as cradling Lockman. Additionally, at least one officer explicitly made the connection for the jury, stating LePon had been trying to help stem Lockman's bleeding, so it "made sense then that [LePon] would have blood on his clothes." Although the State had the expert reconstructionist prepare a report concerning blood spatter analysis of LePon's

---

[8] LePon also claims the underlying affidavit was completed with a "reckless disregard for the truth" because it did not inform the neutral magistrate that LePon and Book had immediately proclaimed the shooting as accidental, that LePon had assisted in stemming the flow of blood from Lockman's wound when directed, or that LePon had called 911 to report the gunshot wound. LePon has not cited any authority for the proposition that the affiant has a duty to inform the magistrate that possible suspects deny their involvement in the possible crime or were involved in corrective measures after a possible crime occurred. We do not consider this claim further.

clothing, the parties agreed not to ask the expert questions about the defendant's clothing in front of the jury.

**C. Right to Attorney.** LePon urges us to create a "bright-line rule" under the due process protections of article I, section 9 of the Iowa Constitution to preclude law enforcement from speaking with someone who has requested an attorney, regardless of whether that person is in custody or a criminal prosecution exists. LePon urges the adoption of this rule because the district court has already ruled he was not in custody during his police interview—preventing his reliance on Fifth Amendment protections—and criminal prosecution had not yet begun—meaning the right to counsel had not yet attached under the Sixth Amendment. *See State v. Green*, 896 N.W.2d 770, 776 (Iowa 2017) (stating article I, section 10 of the Iowa Constitution provides the right to counsel for all accused in criminal prosecutions).

LePon has not made this argument to the district court, and it is not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Even if LePon had properly raised the argument before, as we noted above, we believe it is the role of the supreme court to interpret the Iowa Constitution anew. *See State v. Wagamon*, No. 16-0374, 2017 WL 108581, at *3 (Iowa Ct. App. Jan. 11, 2017) (citing *State v. Miller*, 841 N.W.2d 583, 584 n.1 (Iowa 2014)) (declining defendant's request to reexamine prior case law under the Iowa Constitution).

**D. Cell Phone Records.** LePon also makes a general assertion regarding the validity of the search warrant obtained to search his cell phone records (that were kept and provided by the cell phone company), which showed his outgoing and ingoing calls, text messages, chats, and more. This issue was raised to the district court, and the court found:

> The search warrant sets forth probable cause to believe that a crime, or indeed crimes, had been committed and that the cell phone contained information relevant to the crime of murder as well as the assaults that allegedly occurred on December 24, 2013 and December 31, 2013. The warrant application was not defective. It established probable cause for believing the phone contained evidence of the crime. The warrant sets forth what specific data is to be retrieved.

LePon has not specified an error made by the district court in reaching this conclusion; he simply maintains the court's conclusion is wrong. We disagree; the court properly denied LePon's motion to suppress his cell phone records.

**E. Content of LePon's Cell Phone.** LePon also argues the content of his cell phone should have been suppressed as evidence.

The police downloaded the content from LePon's cell phone in the early morning hours of December 21, 2013, and then immediately returned the device to him. At some point thereafter, Book apparently ended up with LePon's phone and threw it in a ditch. Police recovered the phone from the ditch on January 10, 2014, and obtained a warrant to (again) download or search the contents of LePon's phone on January 16. On appeal, LePon argues the police's recovery of the phone from the ditch and the later search pursuant to a warrant was invalid. The remedy for illegal searches and seizures is suppression. *See State v. Grant*, 614 N.W.2d 848, 855 (Iowa 2000) ("The appropriate remedy for such

violation is suppression of all evidence directly or indirectly gathered through the search."). But here, the State consented not to use the evidence, stating at the hearing on the motion to suppress:

> The State is not going to resist suppression of contents from the defendant's cell phone or contents from the defendant's tablet. The State has reviewed these items and has determined, as far as the State's case in chief is concerned, there's nothing of evidentiary value or relevance to the case. So there's simply no need to argue these items.

In other words, the State already agreed before trial to the remedy LePon now seeks; LePon has not argued the State violated its agreement not to use such evidence. Thus, there is no claim of error for us to review.

### 3. Dismissal of Other Charges.

Lepon argues the district court violated his state and federal due process rights when it allowed the State to dismiss charges of willful injury causing bodily injury, domestic abuse assault impeding air/blood flow, and two counts of violation of a no-contact order against LePon.

The charges in question stem from Book's allegations concerning New Years Eve 2013. It was as a result of these charges that LePon was in custody on January 3, 2014, when Book returned to the Ames police station and reported, for the first time, that she saw LePon walk up to Lockman with the gun and shoot him in the face.

LePon argues on appeal there "was no probable cause to establish the charges." Additionally, he claims he should have been allowed to go to trial in order to respond to the charges against him and create a record evincing "the bad faith of the prosecution and obvious distortions of the police 'investigations'"

including "the falsity of the allegations, the prosecution's unethical use of such testimony, and the police department's misconduct regarding manufactured testimony."

Iowa Rule of Criminal Procured 2.33(1) requires the district court to provide legally sufficient reasons when dismissing charges and restricts the court's dismissal of charges to those instances when it is "in the furtherance of justice." The question of whether the dismissal of charges was done in the furtherance of justice is reviewed for an abuse of discretion, and the defendant has the burden to show the court's discretion was exercised on grounds clearly unreasonable. *See State v. Taeger*, 781 N.W.2d 560, 564 (Iowa 2010). Here, LePon makes a number of allegations which, if supported by the record, would lead us to conclude the district court abused its discretion. *Id.* But LePon has no such record. The State moved to dismiss the charges on February 17, 2014, and the district court granted the motion on the same day. The only other reference to the charges in the file before us is a January 27, 2015 order from the district court—almost one year later—noting LePon had objected to the dismissal of the unrelated charges and denying LePon's motion to reinstate them. LePon did not appeal from either the dismissal of the charges or the district court's order denying his motion to have them reinstated.

For all the foregoing reasons, we are unable to review LePon's claim.

**4. Evidentiary Rulings.**

LePon challenges a number of the evidentiary rulings made by the district court. We generally review the district court's evidentiary rulings for an abuse of discretion. *See Williams v. Hedican*, 561 N.W.2d 817, 822 (Iowa 1997).

**A. Manner of Death.** LePon maintains the district court abused its discretion when it allowed expert witness Assistant State Medical Examiner Michelle Catellier, who performed the autopsy on Lockman, to testify regarding her opinion Lockman's death was a homicide. LePon argues Dr. Catellier's testimony was "an impermissible comment on the credibility of other witnesses," namely, that of Book.

"Iowa is generally 'committed to a liberal view on the admissibility of expert testimony.'" *State v. Tyler*, 867 N.W.2d 136, 153 (Iowa 2015) (citation omitted). Iowa Rule of Evidence 5.702 allows expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." While an expert's testimony "is not admissible merely to bolster a witness's credibility," it "is not objectionable because it embraces an ultimate issue to be decided by the jury." *Id.*

"[W]hether a medical examiner's opinion on cause or manner of death is admissible depends on the particular circumstances of each case." *Id.* at 162. "For example, when a medical examiner bases his or her opinion of cause or manner of death largely on witness statements or information obtained through police investigation, such opinions would ordinarily be inadmissible under rule 5.702 because they would not assist the trier of fact." *Id.* In contrast, when a medical examiner bases his or her opinion on cause or manner of death primarily on the autopsy, such opinions will likely assist the jury in understanding the evidence and would ordinarily be admissible." *Id.* at 163.

Here, Dr. Catellier's opinion as to the manner of death was, as the district court found, "based primarily on the physical evidence revealed during her

autopsy." In fact, at the time she performed the autopsy, the police had previously informed Dr. Catellier that Lockman had been inebriated and playing with the gun when it accidentally discharged. Based on the autopsy and her experience and expertise, Dr. Catellier determined Lockman had sustained a "hard contact wound," which is consistent with the gun discharging while it is pressed firmly against the skin. Because of her observations, it was the doctor who told officers the medical evidence was not consistent with the information they then had about the shooting. Dr. Catellier asked to study the weapon at issue. After she received the weapon from the police and compared the muzzle of the gun to the mark left on Lockman's face, along with the trajectory the bullet had traveled through Lockman's head, Dr. Catellier classified the manner of death as homicide. When she made the classification, the medical examiner had been notified that Book had informed officers it was LePon who had shot Lockman, but it appears to us that Dr. Catellier used Book's third version of the event on the night in question as a theory against which to test the medical and scientific evidence the doctor had already observed. *Cf. id.* at 177 (finding the court abused its discretion in admitting evidence of manner of death when the medical examiner's opinion was based primarily on "inconsistent and uncorroborated statements . . . as opposed to objective, scientific, or medical evidence").

LePon also complains that the medical examiner was allowed to testify as to the manner of death because Dr. Catellier admitted she could not rule out the possibility that Lockman's injury was the result of an accidental shooting. But "there is no requirement that the expert be able to express an opinion with

absolute certainty.  A lack of absolute certainty goes to the weight of the expert's testimony, not its admissibility."  *Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 637 (Iowa 1997) (internal citation omitted).

The district court did not abuse its discretion in allowing the medical examiner to testify regarding the manner of death in this case.

**B. Prior Bad Acts.**  LePon maintains the district court abused its discretion when it allowed Book to testify about LePon's "prior bad acts"—that he had used methamphetamine the day prior to and the day of the December 20 shooting.

In order for prior-bad-acts evidence to be admissible under Iowa Rule of Evidence 5.404(b):

> (1) "the evidence must be relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts"; (2) "there must be clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (alteration in original) (citation omitted).  Here, LePon challenges only the first and third prong; he does not dispute there was clear proof he had used the drug.

LePon's use of methamphetamine was relevant to show its effect on his mental state and to explain a possible motive.  LePon's theory of the case was that Lockman was the one under the influence at the time of the shooting and Lockman's intoxication led him to accidentally discharge the firearm.  In contrast, the State presented evidence that Lockman had taken Book's side in an argument against LePon, and LePon was angry and shot Lockman as a result.

As the State offered by way of explanation when defending against the objection to the evidence, "It provides the . . . explanation for what otherwise might seem to some people to be irrational behavior."

Additionally, LePon argues that even if the evidence of his methamphetamine use was relevant, it should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice to him. We note that the testimony regarding LePon's use of methamphetamine on December 19 and 20 was limited to a few questions posed to Book on the first day of the ten-day trial. Book testified she and LePon had both used the substance on the two days in question and that although she had slept some, LePon had not. This limited amount of testimony with its general lack of detail creates little danger of unfair prejudice. *See, e.g.*, *Id.* at 152 (noting "the district court carefully circumscribed the scope of the other acts testimony and thereby limited its potential prejudicial impact"); *State v. Rodriguez*, 636 N.W.2d 234, 246 (Iowa 2001) (putting the prejudicial impact of the testimony "in perspective," noting the State "did not elicit great detail about the prior [bad acts] and spent a relatively small amount of time on this line of questioning"). In contrast, we believe the probative value is great. Moreover, "[w]eighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.'" *State v. Putman*, 848 N.W.2d 1, 10 (Iowa 2014) (quoting *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006)).

We cannot say the district court abused its discretion in allowing evidence of LePon's use of methamphetamine in the two days prior to the shooting of Lockman.

**C. Expert Testimony.** LePon claims the district court abused its discretion when it allowed the State's expert crime scene reconstructionist, Kenneth Martin, to testify. LePon maintains that while Martin was qualified to testify as an expert, Martin's actual testimony "was unreliable, insomuch as it overwhelmingly went against firsthand accounts." LePon does not specify what "firsthand accounts" Martin's testimony contradicted; we presume he is referring to his own. The State's use of an expert witness that has a different theory—based on the expert's own evaluation of the evidence and relying on their area of expertise—than that of the defendant regarding how the event occurred is not a legal reason for preventing the expert from testifying. Based on LePon's current claim of error, we cannot say the district court abused it discretion in allowing the State's expert to testify.

**5. Motion for Mistrial.**

LePon maintains the district court abused its discretion when it denied his motion for mistrial after Dr. Catellier testified Lockman suffered from a hard contact wound, which means "there has to be some holding of the gun against the skin and usually that implies intent." LePon argues Catellier's statement was an "impermissible opinion as to whether a particular legal standing has been satisfied."

Here, defense counsel immediately objected, and that objection was sustained. Later, at a natural break in the proceedings, the defense moved for a mistrial. The court overruled the motion, stating:

> When the comment is read on paper aside and apart from the proceeding that was going on, it may appear to have some implication that Dr. Catellier was making a comment about the intent of the person holding the weapon. I don't think that intent is what she was talking about. She was testifying immediately prior to the short transcript about the gun being tossed from hand to hand and talking about how difficult it would be, if not impossible, for that throwing of the gun from one hand to the other to end up with the muzzle impressed upon the cheek in such a fashion that the impression of the end of the weapon would leave marks that she described yesterday, the tearing of the skin and the impression that you could clearly see in some of the photographs.
>
> So, I don't believe she was talking about the intent of the person holding the gun to kill somebody or to be anything other than the intent to hold it against the cheek.

"Trial courts have considerable discretion in passing on mistrial motions, and reversal is proper only upon a showing that discretion was abused." *State v. Lawrence*, 559 N.W.2d 292, 294 (Iowa Ct. App. 1996). "When the trial court responds quickly to objectionable evidence, the defendant bears a heavy burden of demonstrating a clear abuse of a discretion on the part of the trial court." *Id.*

"[A]n expert may not opine as to whether a particular legal standard has been satisfied or to 'the defendant's guilt or innocence.'" *Tyler*, 867 N.W.2d at 153–54 (quoting *State v. Smith*, 522 N.W.2d 591, 593–94 (Iowa 1994)). But, as stated above, an expert is allowed to offer opinion testimony "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," even when that "embraces an ultimate issue to be decided by the jury." Iowa R. Evid. 5.702; *Tyler*, 867 N.W.2d at 153. Here, we agree with the district court's understanding of the expert's

testimony, namely, that Dr. Catellier was referring to the intent to perform a physical act—placing the gun's muzzle against the skin—as shown by the physical, medical evidence. This was in contrast to her testimony regarding the type of wound one would expect to see if the gun discharged while it was being switched from hand to hand.

"A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *Newell*, 710 N.W.2d at 33 (citation omitted). In other words, "[t]he pertinent question is whether the trial court was clearly unreasonable in concluding an impartial verdict could be reached notwithstanding" Dr. Catellier's testimony using the word "intent." *Id.* The district court's ruling was not unreasonable. First, as stated above, we agree with the district court's understanding of Catellier's testimony, which was that her testimony did not in fact invade the province of the jury. Additionally, even if the jury's understanding of the doctor's testimony does not match our understanding, we cannot say the district court was unreasonable to conclude the single reference to intent, where there were no questions that elaborated on this information and where the trial lasted approximately two weeks, did not prevent LePon from receiving a fair trial. *See id.*; *see also State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989) ("It is of significance that the incident was isolated.").

### 6. Sufficiency of the Evidence.

LePon claims the district court erred when it denied his motion for judgment of acquittal. He maintains there is insufficient evidence to support his conviction for second-degree murder, arguing the evidence does not support the

jury's finding that he acted with malice aforethought, shooting and killing Lockman.  The State responds that LePon has failed to preserve error on this claim because he did not reference a specific element of the crime in his motion—malice aforethought.

Generally, sufficiency-of-the-evidence claims are preserved through a timely and specific motion for judgment of acquittal.  *See State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) ("[W]hen the motion for judgment of acquittal did not make reference to the specific elements of the crime on which the evidence was claimed to be insufficient, it does not preserve the sufficiency of the evidence issue for review.").  Our supreme court has recognized "an exception to the general error-preservation rule when the record indicates that the grounds for a motion were obvious and understood by the trial court and counsel." *Id.*  But that was not the case here.  Rather, LePon argued the court should grant his motion for judgment of acquittal because "even when the evidence is taken in the light most favorable to the State, they have failed to make a prima facie showing that [LePon] is guilty of first degree murder."  LePon asks us to now assume the court understood his statement to mean he was challenging the State's evidence to support the requisite intent element of each of the lesser-included offenses as well and ruled accordingly.  Nothing in the record allows us to make such a leap.

Because LePon has not preserved argument regarding the sufficiency of the evidence to support his conviction for murder in the second degree, we do not consider it further.

**7. Prosecutorial Misconduct.**

LePon enunciates a number of "calculated and unethical acts and ommissions," which he attributes to the prosecutors who tried the case against him. Apparently realizing he does not presently have the record to support such claims, LePon simply states, "An evidentiary hearing is required to fully develop the record on these matters." Additionally, we note LePon did not raise these claims to the district court. We do not consider this claim further.

**8. Ineffective Assistance.**

LePon raises two issues under the ineffective-assistance-of-counsel framework. He claims trial counsel was ineffective for failing to challenge the weight of the evidence to support his conviction and for failing to recall Book as a witness after the district court changed an earlier ruling, deciding the defense could raise certain issues in front of the jury to show Book's bias.

To prove his claims of ineffective assistance of counsel, LePon must prove by a preponderance of the evidence that (1) counsel failed to perform an essential duty and (2) he suffered prejudice as a result. *See State v. Morgan*, 877 N.W.2d 133, 136 (Iowa Ct. App. 2016). The claim fails if either prong is not proved. *Id.* When analyzing the prejudicial effect of multiple allegations of ineffective assistance of counsel, we "look to the *cumulative* effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (emphasis added) (referencing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "If an ineffective-assistance-of-counsel claim is raised on direct appeal from the criminal proceedings, we may decide the record is adequate to decide the claim

or may choose to preserve the claim for postconviction proceedings." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

The State maintains LePon's first claim of ineffective assistance—whether counsel breached a duty in failing to recall Book as a witness—would be better resolved in an action for postconviction relief. The State notes a number of valid strategic reasons defense counsel may have had for not recalling the witness and maintains counsel should have an opportunity to respond to LePon's claims. A "primary reason" for preserving a claim of ineffective assistance for further development of the record is "to allow the attorney charged to respond to the defendant's claim." *See State v. Brubaker*, 805 N.W.2d 164, 170 (Iowa 2011). We also allow for the development of the record so we can learn counsel's actual reasons for an action or inaction, rather than "automatically assum[ing] every alleged misstep was a reasonable strategy simply because some lawyer, somewhere, somehow, under some circumstances at some time would have done such a thing." *See State v. Ondayog*, 722 N.W.2d 778, 787 (Iowa 2006).

Because the record does not indicate trial counsel's thinking on the decision not to recall Book after the district court changed its ruling on the issue of presenting her bias to the jury, we preserve this claim for a possible postconviction action. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010). Because we are to evaluate the defendant's claims of ineffective assistance by determining if the cumulative effect of the alleged errors resulted in *Strickland* prejudice, we also preserve LePon's claim counsel was ineffective for failing to challenge the weight of the evidence. *See State v. Keys*, No. 15-1991, 2017 WL 1735617, at *9 (Iowa Ct. App. May 3, 2017) (citing *Clay*, 824 N.W.2d at 494)

(preserving defendant's multiple claims of ineffective assistance where the lack of record prevented the court from resolving a number of claims on direct appeal in order to properly evaluate the cumulative prejudicial effect).

**III. Conclusion.**

Having considered each of LePon's claims and finding no reversible error, we affirm LePon's conviction for murder in the second degree.

**AFFIRMED.**